**E-FILED**
Thursday, 20 July, 2006  10:26:48 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| VICKIE MURPHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-1249 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY | ) | |
| . | ) | |
| | ) | |
| Defendants. | ) | |

# O R D E R

This matter is now before the Court on Plaintiff's Motion for Summary Reversal and the Commissioner's Motion for Summary Affirmance.  For the reasons set forth below, Plaintiff's Motion for Summary Reversal [#11] is DENIED, and Commissioner's Motion for Summary Affirmance [#15] is GRANTED.

## BACKGROUND

Vickie Murphy, ("Murphy"), was born on February 28, 1952. (R. at 16.) She is currently 54 years old, stands 5'1" and, as of April 20, 2005 weighed approximately 206 pounds. (R. at 48.)  For 33 years, Murphy smoked a pack of cigarettes a day, but has recently decreased that by half. (R. at 60.)  She is a lifelong resident of Pekin, Illinois, who left school at the beginning of the spring semester of her sophomore year in high school. She married Eloid E. Murphy, Jr.,("Ed"), on November 5, 1971. (R. at 386.) Murphy had two daughters with her husband, but experienced deep vein thrombosis

1

("DVT") during her second pregnancy. (R. at 48.)  In 1982, at the age of 29, she had to have a total abdominal hysterectomy due to fibroid cysts.  Id.  In 1985, she obtained her GED and divorced her husband. (R. at 133.)  Between 1985 and 1997, Murphy worked as an assembly worker, mechanic, office assistant, sales clerk, fast food server, and dog groomer. (R. at 124-27.)  Her last position before the onset date of this claim[1] was at APAC Teleservices, where she worked as a telemarketer until 2001. (R. at 128.)

Prior to 1997, Murphy was diagnosed with coagulpathy and protein C & S deficiencies, a blood disorder that dangerously increases clotting, and was prescribed Coumadin after this condition led to the amputation of the second toe on her right foot. (R. at 438.)   She briefly ceased the therapy in 2000 because she could not afford the prescription and it resulted in the amputation of the second finger of her left hand. (R. at 332.)  During that year, she was also diagnosed with migraines, osteoarthritis, and had her gallbladder surgically removed. (R. at 334-35.)  It was also at this point that her asthma, chronic obstructive pulmonary disorder ("COPD"), acid reflux disorder, diabetes, hypertension, incontinence with a pelvic floor disorder, and allergies to Vicodin, Demerol, and Keflex were first noted. (R. at 336-37.)

While employed at APAC, Murphy's COPD began to worsen and the frequency of her asthma attacks increased.  It was during this time that Murphy first reported having what she believed to be "seizures" at work and had to go to the emergency room. The episodes were later determined to be panic attacks brought on by Murphy's distress from being unable to breath during an asthma attack. (R. at 766.)  In 2001,

---

[1] Murphy has had two previously denied claims for disability benefits, but they were not examined in the decision of this claim.

Murphy had to have a fifth surgery when a cyst was removed from her vocal chords and she had to undergo speech therapy to relearn how to use her voice. (R. at 878-90.) After this point, Murphy ceased working altogether because her doctors advised her that she should not return to telemarketing.  (R. at 877,1014.) She still suffers from chronic laryngitis after speaking for long periods of time, and even expirenced a coughing episode during her testimony at her hearing. (R. at 1037-38.)

In early November 2003, Murphy's primary care physician, Dr. Hargobind Khurana, recommended that Murphy see a psychiatrist to help her control her panic attacks. Also, her pulmonary specialist, Dr. Chittivelu, referred her to a Dr. Cadden to be psychiatrically examined for depression and anxiety. (R. at 766-69.) However, there is nothing in the record to suggest that Murphy ever made an appointment with or went to see Dr. Cadden or any other psychiatrist or psychologist for her anxiety and depression. Upon review of her application, the SSA provided for Murphy to be both physically and psychiatrically examined by the SSA's experts.  Murphy made general objections to the propriety of using these evaluations because she was not able to cross-examine their findings; however it was the findings of the SSA's psychological examiner, Dr. Marvin Turl, that she believed were most objectionable.

Murphy claimed that Dr. Turl's evaluation of her personality was particularly harsh. He claimed Murphy's behavior was "histronic" and that when she spoke of her depression she began to cry "as if on cue." (R. at 735-37.) He infers from Murphy's medical records that she is a malingerer and criticizes her prepared list of medications as evidence that her responses were well-rehearsed and that she has an abusive

3

personality. Id.  He alleged that she purposefully answered certain questions wrong during the exam and spontaneously offered information about experts she was trying to see to help her with her health. (R. at 738-39.) Ultimately, Dr. Turl concluded that she had no disabling mental disorder. (R. At 739.) Murphy had been previously examined by SSA psychiatric examiner, Dr. Joel Eckertt, on August 18, 2001, in connection with a previous disability claim which was denied.  (R. at 379-87.)  Although Dr. Eckertt contends that Murphy's preparedness was appropriate and understandable given the importance of this case, he also found that Murphy does not suffer from disabling depression. (R. at 387.)

At the hearing on November 13, 2003, Murphy had the opportunity to testify before Administrative Law Judge Anthony Wood ("ALJ") about the limitations she felt she had. When the ALJ asked her what she felt was her most serious condition, she replied; "my breathing and my shaking," despite never having complained of shaking before that time. (R. at 1018.) In subsequent medical records submitted after the hearing, Murphy reported to her doctors that her asthma was greatly improved. (R. at 905.) The ALJ also addressed the issue of Murphy's panic attacks. (R. at 1018-24.) Although she testified that she has had them her whole life and while employed at APAC she was sent to the emergency room because of these attacks several times a week, this was not supported by the emergency room records from the time period when Murphy was working as a telemarketer. (R. at 1018-21.) Murphy also testified that although she must take frequent breaks or sit down, she is able to cook for herself, do her dishes, clean her house, walk to her friends houses to visit when the weather is not

4

too hot, and can crochet for 30 minutes at a time. (R. at 1004-51.) Murphy has since

reported to her doctors that her depression and panic attacks have greatly improved.

(R. at 951.)

Vocational expert, Dennis Gustafson, testified at the hearing and the ALJ posed

to him a hypothetical illustrating a person of Murphy's "age, education and work

experience" and with a "capacity for light work." (R. at 63.)  Since the onset date of

Murphy's claim was in 2001 when Murphy was 49 years old, the ALJ focused  the

hypothetical to apply to the period of time that Murphy was under 50 years old. (R. at

62.) The ALJ included these limitations;

> [S]he is limited to lifting no more than 20 pounds at a time with frequent
> lifting or carrying of objects up to 10 pounds. She is limited to occasional
> climbing. She is able to perform balancing, stooping, kneeling, crouching
> and crawling. She is to avoid concentrated exposure to extremes, fumes,
> dusts, odors, chemicals, gas, humidity and wetness and hazards of
> unprotected heights and dangerous machinery.  She needs a low stress
> job where she can work at her own pace while meeting production
> standards. she is limited to only frequent talking.

(R. at 62-63.)  At the hearing, the ALJ also clarified that Murphy was capable of a "full

range of light work with no climbing of ladders, ropes and scaffolds, but other postural

functions performed occasionally; manipulative functions performed frequently". (R. at

1052.) The VE confirmed that these limitations prevented her from returning to the type

of jobs Murphy had before and that she had minimal transferable skills. Id. The VE

testified that given those limitations, Murphy is still able to perform around 5,242 general

office clerk jobs, 3,358 teacher's aid position, and 6,061 job classified under personal

service, around 18,465 industrial jobs and 6,539 production assembly positions. (R. at

1053-54.)

5

The ALJ then added the possibility that Murphy would need a sit/stand option and be able to work at her own pace in a low stress environment. (R. at 1052.) The VE testified that adding those factors would limit the jobs Murphy is able to perform to those of teachers aid, general office clerk, and personal service, but that she would still be capable of working in the national economy. Id.  Murphy posed the alternative need to have "an air-conditioned tempeture controlled, humidity controlled environment" for working instead of avoiding extremes in temperature and humidity and a capacity for only sedentary work. (R. at 1060.)

However, the ALJ found that there was no substantial evidence to support the claim that Murphy required a temperature and humidity controlled, air-conditioned environment and held that she was capable of a full range of light work. The ALJ held the record open for Murphy to submit any further medical records until August 26, 2004, when he entered his decision denying Murphy disability benefits. (R. at 56-63.)

## DISCUSSION

In order to be entitled to disability benefits, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two step process.  First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, impairment, or which has lasted or can be expected to last for a continuous period of not less than 12

6

months. 42 U.S.C. § 1382(c)(a)(3)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. <u>McNeil v. Califano</u>, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed?; (2) is the plaintiff's impairment "severe?"(20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments? (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) id the plaintiff unable to perform his or her former occupation?; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. <u>Garfield v. Schweiker</u>, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. <u>Tom v. Heckler</u>, 779 F.2d 1250 (7th Cir. 1985); <u>Halvorsen v. Heckler</u>, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. <u>Pugh v. Bowen</u>, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were

applied. <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the

ALJ's findings are supported by substantial evidence, the Court must consider whether

the record, as a whole, contains "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401,

91 S.Ct. 1420 (1971).  Credibility determinations made by the ALJ will not be disturbed

unless the finding is clearly erroneous. <u>Anderson v. Bessemer City</u>, 470 U.S. 564, 573,

105 S.Ct. 1504 (1985); <u>Imani v. Heckler</u>, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S.

988, 107 S.Ct. 580 (1986).

In her appeal, Murphy focuses on step five of the test and argues that the ALJ's

decision is not supported by law. First, Murphy alleges that the Social Security

Administration ("SSA"), which includes the ALJ hearing her claim and Dr. Marvin Turl,

the psychiatrist employed to evaluate her psychological condition, are biased against

disability claimants. Second, Murphy claims that the ALJ denied her claim because she

is an obese smoker. Third, Murphy alleges that the ALJ improperly discredited her

allegations of severe pain.  Fourth, Murphy argues that the use of Dr. Turl's evaluation

denied her a full and fair review of her claim. Fifth, Murphy claims that the hypothetical

that the ALJ presented to the Vocational Expert ("VE") failed to include all her limitations.

Finally, she argues that the ALJ violated her due process rights by failing to make the VE

provide the Dictionary of Occupational Title Numbers ("Occupational Title Numbers") for

the jobs included in his testimony.  In response, the Commissioner argues that this is not

the proper forum to allege that the SSA is biased, the ALJ properly referenced smoking

and obesity as individual factors in his analysis, the ALJ did not improperly discredit her

allegations of severe pain, Dr. Turl's report was properly included as evidence, the

8

hypothetical sufficiently addressed Murphy's limitations, and the ALJ was not obligated to make the VE provide the occupational title numbers for the jobs included in his testimony.

**A. Murphy's Bias Claim is Beyond This Court's Jurisdiction**

Murphy claims that the SSA, the ALJ and Dr. Turl are biased because they purposefully deny claimants seeking disability benefits despite the evidence before them. The Commissioner denies these allegations and argues that this is not the appropriate forum for Murphy to make allegations of systemic bias against the SSA because this case is limited to the question of whether the ALJ improperly denied Murphy benefits. Furthermore, in reviewing Murphy's claim that the ALJ was biased against her, the Commissioner notes that the Supreme Court has limited the Court to the question of whether an ALJ formed his decision on "some basis other than what the judge learned from his participation in the case." United States v. Grinell Corp., 884 U.S. 563, 583 (1966); *See also* Pearce v. Sullivan, 871 F.2d 61,63 (7th Cir. 1989) (holding that an ALJ is biased if his decision is the result of a prejudgement of something he learned outside the courtroom rather than the record evidence).  The Commissioner argues that Murphy has failed to set forth any evidence that the ALJ in this case pre-judged Murphy's claim or that he ignored the evidence when making his decision.

The Court agrees with the Commissioner that this is not the appropriate forum for Murphy's allegation that the SSA is systemically biased against disability claimants. However, the Court finds that this is the appropriate forum for Murphy to argue that the ALJ who decided her case was biased against her. In reviewing the evidence before the Court, it is clear that the ALJ did not pre-judge Murphy's claim because he included

information that was only revealed at the hearing in this hypothetical to the VE.  The hypothetical included the fact that Murphy needed to be in a low stress work environment where she could work at her own pace, despite the findings of both psychiatric evaluations in the record. (R. at 61.) Moreover, a review of the ALJ's opinion indicates that he did take into consideration all the medical evidence when he made his decisions. For example, the hypothetical included a limitation that Murphy could only work at a job where she could refrain from excessive talking in accordance with her physician's recommendation that she no longer work as a telemarketer, and included limitations on environmental conditions that would aggravate her asthma, COPD and chronic bronchitis. Id.  Furthermore, the ALJ was amenable to hearing additional evidence from Murphy because he kept the record open for a year to allow her the opportunity to submit additional evidence to rebut the testimony at the hearing as well as Dr. Turl's findings before he wrote his decision. (R. at 1067.) The ALJ also addressed the findings of Murphy's treating physicians and her own testimony in his decision. Accordingly, as nothing in the ALJ's opinion indicates that he disregarded the medical evidence or that he pre-judged Murphy's claims of disability, the Court finds that the ALJ was not biased in finding that Murphy was not disabled.

### B. __Murphy Was Not Denied Benefits Because She is an Obese Smoker.__

Murphy alleges that the ALJ found that she was not disabled because she is an obese smoker.  She points to three factors to support her claim. First, Murphy argues that the tone of the ALJ's decision proves that he denied her benefits because she is obese and smokes.  Second, she claims that the ALJ denied her claim because she is an obese smoker rather than analyzing the medical evidence in the record.  Finally, she

alleges that the ALJ was prohibited by law from referencing smoking and obesity because they are improper credibility factors.  In response, the Commissioner argues that the ALJ properly referred to smoking and obesity for their value as part of the record as a whole.

**1. The ALJ's tone was not demeaning to Murphy.**

The Seventh Circuit has held that "mild judicial intemperance does not suspend the substantial evidence rule." Pearce v. Sullivan, 871 F.2d 63,64 (7th Cir. 1989); *Cf.* Sarchet v. Chater, 78 F.3d 305 (7th Cir. 1996) (holding that the ALJ's decision was improper because it included language reflecting total ignorance of the nature of the claimant's illness, a misrepresentation of the hearing testimony, and a prejudice against claimant's socio-economic class). Murphy argues that the tone of the ALJ's decision is so degrading that it proves he denied her claim because of his personal opinions about obese smokers. However, a review of the ALJ's decision shows that he never adopted an improper tone towards Murphy, especially regarding her smoking and weight.

Despite Murphy's assertions, the Court does not find that the ALJ's tone was improper or that it implies that the ALJ denied Murphy disability benefits because of his personal beliefs about obesity and smoking.  Although the ALJ made five references to Murphy's smoking in his decision, there is nothing improper about his tone.

In his decision the ALJ stated:

The claimant had speech therapy and was advised by the therapist not to return to telemarketing due to continual vocal use required by the job. Although the claimant was advised to completely abstain from smoking, she has continued to smoke.

* * *

She alleges shortness of breath for several years. She smoked 1 pack of cigarettes per day for 33 years, but recently reduced her use to a half pack a day.

* * *

The claimant continues to smoke a half pack to a pack of cigarettes per day despite physician's repeated orders that she stop. Yet, despite the claimant's refusal to stop smoking, testing shows no significant obstructive airway disease.

* * *

[T]he treating physician opined that the claimant was probably having a panic attack secondary to the dyspnea. The claimant was strongly encouraged to stop smoking.

* * *

Despite the Claimant's breathing problems she continues to smoke at least a half pack to a pack of cigarettes per day, which suggests that her lung problem does not limit her as much as she alleges. She has not had lung surgery and none has been recommended.

(R. at 57-61(internal citations omitted).) The ALJ's language does not reflect an improper tone because each time he raised the issue of smoking it was to summarize the medical findings of Murphy's physicians. Furthermore, the ALJ admitted that Murphy was able to decrease her cigarette intake by half and that her lungs have not been effected by 33 years of smoking when he determined her credibility.

Murphy also argues that the ALJ's tone was improper because he mentions her obesity in his decision. However, the only reference that the ALJ made to Murphy's weight is that she is "obese at the height of 5'2" and the weight of 296 pounds." (R. at 59.) Although the Court recognizes that the ALJ was in fact mistaken as to Murphy's actual weight, he never raised the issue again and a full reading of the opinion does not indicate that Murphy's weight improperly factored into his decision.  Therefore, the Court finds that the ALJ's tone does not prove that he denied Murphy benefits because she is

12

an obese smoker.

### 2. The ALJ did not ignore the medical evidence.

Murphy claims that the ALJ denied her claim because she is an obese smoker rather than analyzing the medical evidence in the record.  She argues that his decision violated the Seventh Circuit's rule prohibiting an ALJ from "replacing the medical opinion of a physician with his own beliefs." Rousey v. Heckler, 771 F.2d 1065, 1069 (7th Cir. 1985). However, a review of the ALJ's decision shows that he properly considered the medical evidence in the record in making his decision.

Specifically, the ALJ cited to the findings of multiple medical tests showing that Murphy's pulmonary system was functioning normally, her heart was clear of any sign of congestive heart failure, and her asthma, arthritis and back pain were well controlled by medication. (R. at 58.) Before he stated that Murphy's smoking detrimentally effected her credibility, he said "despite claimant's refusal to stop smoking, testing shows no significant obstructive airway disease." Id. This does not show the ALJ denied Murphy's claim *because* she was obese and continued to smoke.  Rather it shows that he found she was not disabled *even though* she was obese and continued to smoke. Accordingly, the Court finds that the ALJ properly considered the medical evidence and did not base his decision on the fact that Murphy is an obese smoker.

### 3. Smoking and Obesity are legitimate credibility factors.

Murphy claims that the Seventh Circuit considers smoking and obesity to be improper factors for an ALJ to address in his decision. However, a review of the case law

indicates that the Seventh Circuit has actually held that it is improper for an ALJ to *ignore* the effects that factors like smoking and obesity can have on a claimant's condition. Sarchet v. Chater, 78 F.3d 305, 308 (7th Cir. 1996). *See also* Johnson v. Barnhart, 449 F.3d 804, 807 (7th Cir. 2006) (finding that although an ALJ may not deny a claim based solely on the claimant's obesity, he has a duty to consider it in his analysis because excessive weight will place increased strain on existing injuries and result in an increased severity of pain); Gentle v. Barnhart, 430 F.3d 865, 868 (7th Cir. 2005) (finding that obesity and other health conditions must be considered for their incremental effect on the disability); Mendez v. Barnhart, 439 F.3d 360, 363 (7th Cir. 2006) (finding the ALJ had to consider the effect of the claimant's obesity on her physical abilities, health, and depression in his evaluation of her alleged disability).

The Seventh Circuit holds that an ALJ's references to factors such as somking and obesity are improper only if they make up the sole foundation of his decision that the claimant is not disabled. *See* Sarchet, 78 F.3d at 307(holding that the ALJ's decision was improper because she ignored the medical evidence in the record and denied the claim based on her own beliefs about the claimant's legitimate medical disorder). *See also*; Rousey v. Heckler, 771 F.2d 1065 (7th Cir. 1985)( reversing the ALJ's denial of benefits where the ALJ found that the claimant would be able to work if she quit smoking despite the lack of medical evidence confirming his belief).  In the instant case, the ALJ made five references to Murphy's continued smoking and one reference to Murphy's obesity. (R. at 57-61.)  However, the only reference that could possibly be considered improper is the statement that the ALJ made expressing his belief that Murphy's smoking diminished her credibility. (R. at 60-61.)  However, the Seventh Circuit has found that an

ALJ is not improperly inserting his own medical opinions when he states his personal opinion if he explains why his decision is also substantially supported by the objective medical evidence. *See* Herron v. Shalala, 19 F.3d 329, 334 (7th Cir. 1994) (holding that even though it was improper for the ALJ to say "one would expect air conditioning to improve claimant's condition by eliminating pollutants" in his analysis, he also explained that the claimants allegations of pain was not supported by the objective medical evidence).

In this case, the ALJ's statement that Murphy's smoking "suggests that her lung problem does not limit her as much as she alleges," does not reflect that the ALJ's decision was based solely on Murphy's smoking habit because the ALJ included additional evidence in the record to support his finding that Murphy was not credible. (R. at 61.) The ALJ compared Murphy's testimony about her capabilities at the hearing with records of what she told her doctors, what her doctors believed she was capable of doing, and the results of multiple physical and psychiatric exams in his decision. (R. at 57-62.) Furthermore, the ALJ explained that he felt Murphy's smoking lessened her credibility regarding the severity of her breathing problems, because even after three decades of smoking all the objective medical evidence continued to show that she has normal lung functioning. Therefore, the court finds that the references the ALJ made to Murphy's smoking and obesity were not prohibited by law.

### B. The ALJ Properly Assessed Murphy's Credibility.

Murphy alleges that the ALJ improperly ignored her allergy to Vicodin and her prescription for Tylenol #3 with Codeine when he found that her allegations of severe

15

pain were not credible. The record establishes that Murphy's back pain is caused by osteoarthritis, hers being a mild case that "is not severe and limiting" and is well controlled by Vioxx. (R. at 602.) Despite this, Murphy claims to be in constant, excruciating pain. Relevant cases require the ALJ to analyze all relevant evidence when a claimant alleges pain that exceeds the severity established in the record. 20 C.F.R. § 404.1529(1993); Herron v. Shalala, 19 F.3d 329, 334 (7th Cir. 1994); *see also* Thompson v. Sullivan, 741 F.Supp. 1297(N.D. Ill. 1990) (citing to Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir, 1984) (citing SSR-82-58)). In reviewing the evidence before the Court, there is nothing to suggest the ALJ improperly failed to consider Murphy's allergy to Vicodin or her prescription for Tylenol #3 with Codeine in his decision.

 In his decision, the ALJ stated that he believed that Murphy's credibility was diminished in part because;

> [T]he claimant's allegations concerning the frequency and severity of her symptoms and limitations are not reasonably consistent with the objective medical evidence or other evidence of record.  Although the claimant alleges chronic back pain at the top of the pain scale, x-rays show her lumbar spine is normal and range of motion of all joints and spine is full. Furthermore, she has not been prescribed a strong, narcotic pain medication as such would be expected for an individual with the degree of pain the claimant alleges.

(R. at 60 (internal citations omitted).) Murphy argues that this is an inappropriate credibility determination because the ALJ overlooks the fact that she has been prescribed a strong narcotic pain medication. She claims that although she is allergic to Vicodin, a commonly prescribed narcotic painkiller, she does take Tylenol #3 with Codeine, an equivalent narcotic grade medication.  Although, the Seventh Circuit holds that an ALJ must address the "dosage, effectiveness and side effects of medication"

16

prescribed to the claimant for his or her pain, *see* <u>Herron</u>, 19 F.3d at 334, it does not say that an ALJ must consider medications prescribed to the claimant for other purposes or those she is no longer taking. Murphy was prescribed Tylenol #3 for when she has migraines, not when her back hurts, and her medical records show that she has not taken it in over a year. (R. at 209.) Furthermore, Murphy does not include Tylenol #3 as one of her current medications in the list she submitted into the record. (R. at 211-14.) Murphy admitted that her physician gave her Vioxx to control her osteoarthritis and records indicate that she is still continuing to take it. (R. at 205-09.)

Additionally, the ALJ found that Murphy's allegations of pain were not supported by objective medical evidence.  The ALJ noted that Murphy's range of motion is normal, she may move and go about her daily activities without assistance or muscle spasms, specifically she is able to clean house, cook, go shopping, visit friends and family, crochet, and maintain her own personal hygiene. (R. at 59.)  Moreover, Murphy's own physician reported that she responded well to the Vioxx and "no further intervention was required." (R. at 559.)  There is nothing in the evidence to imply the medication was not working because Murphy testified at the hearing that she only needed to take one pill at bedtime and the only side-effect she had was slight dry mouth. (R. at 1018.) Based on these facts, the ALJ was correct in his assertion that Murphy was not prescribed the type of pain killer expected for severe pain despite her allergies to Vicodin and previous prescription for Tylenol #3 with Codeine.  Therefore, the Court finds that the ALJ properly analyzed Murphy's allegation of severe pain in his decision.

### C. <u>Dr. Turl's Report Did Not Prevent a Full and Fair Review of the Claim.</u>

Murphy next argues that the written report by Dr. Marvin Turl violated her due

17

process rights because she did not receive proper notice of the examination and did not have the opportunity to cross-examine him.  She also argues that the report was improperly included as evidence and given undue weight over the findings of her treating physicians.

### 1. Murphy does not have a valid due process claim.

Murphy contends that the examination by Dr. Turl violated her due process rights because she did not have notice of his identity before his examination or the opportunity to cross-examine him at the hearing. However, a review of the facts before the Court indicates that Murphy has not met the procedural prerequisites in order to raise this due process claim.

The Supreme Court has held that claimants are barred from arguing such due process violations when they do not request a subpoena from the ALJ before the hearing. 20 C.F.R. § 404.950(d)(allowing claimants the right to request subpoenas of witnesses from the ALJ up until ten days before the hearing is held); Richarson v. Perales, 402 U.S. 389, 404-05 (1971) (holding that the claimant may not allege a due process violation from the inability to cross-examine medical findings when he made no attempt to request subpoenas from the ALJ before the hearing). In the instant case, there is no evidence to indicate that Murphy ever asked the ALJ to serve Dr. Turl with a subpoena to appear at the hearing. Therefore, she cannot now claim her due process rights were violated because she did not have the opportunity to cross-examine him about his findings.

Additionally, Murphy argues that her due process rights were violated because the SSA failed to inform her that Dr. Turl's would be the one to examine her. However,

timely, written notice of a hearing or state examination that is properly sent to a claimant

is not required to include the identity of the examiner.  *See* Subia v. Commissioner of

Social Security, 264 F.3d 899 (9th Cir. 2001).  While the Seventh Circuit has not

addressed this issue, the Ninth Circuit dealt directly with this issue in Subia when it held

that due process rights are not violated by a failure to provide the claimant with the

identity of a state examiner, especially where the ALJ provides the claimant with ample

time to review the evidence and prepare a defense prior the hearing.  Subia is instructive

for this case because, as in that case, Murphy had ample time to review Dr. Turl's

findings and prepare her defense before the hearing.

Both Murphy and her attorney were properly sent written notice of the SSA's

scheduled examinations on July 31, 2003, but were not told the names of the examining

physicians. (R. at 220-21).  Although there is nothing in the record to show exactly when

Murphy saw Dr. Turl's evaluation, the report was dated September 4, 2003. (R. at 735).

This means Murphy had access to the evaluation at least two months before the hearing

on November 23, 2003.  The Social Security Act allows Claimants to submit evidence,

review the record, and make requests for subpoenas from the ALJ until ten days before

the hearing. 20 C.F.R. § 404.950(d).  However, there is nothing in the record to indicate

that Murphy ever requested any subpoenas of the ALJ or submitted any evidence to

discredit Turl's findings even though she had notice of the evaluation well within the

statutory time period allowed to her.

Furthermore, the ALJ held the record open for eleven months to give Murphy the

opportunity to submit any additional evidence; however, Murphy never submitted any

evidence to contradict Dr. Turl's findings. (R. at 1067.) Therefore, the Court finds Murphy

is barred by law from arguing her due process rights were violated by not having Dr.

Turl's name before he examined her because she had ample time to properly develop a

defense and submit evidence to support her claim before and after the hearing.

**2. Dr. Turl's report was properly considered as evidence.**

Murphy argues that the ALJ improperly credited Dr. Turl's report over the findings

of her treating physicians.  However, the Seventh Circuit does not require that the

opinions of a claimant's general practitioners be given controlling weight, only that the

ALJ must give "substantial deference to treating physicians" regarding "speculative

statements of a consulting physician." Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir.

1985). A review of the ALJ's decision shows he did not give Turl's statements more

weight than Murphy's medical records.

The ALJ's decision indicates that he referenced Dr. Turl's findings in his decision

specifically because Murphy had made a formal objection to their inclusion in the record

at the hearing. (R. at 59). The ALJ said he felt that Dr. Turl's findings were "consistent

with the record as a whole". Id.  This statement does not indicate that the ALJ improperly

credited Dr. Turl's report over evidence submitted by Murphy's doctors, especially since

he includes an extensive analysis of that record evidence as a whole.  The ALJ also

referenced the psychiatric examination by Dr. Eckertt, who was also employed by the

SSA.  Murphy had been examined by Dr. Eckertt in connection with a previous disability

claim that was denied. (R. at 57.)  Dr. Eckertt's findings were consistent with Dr. Turl's

decision.  Both doctors found that Murphy does not suffer from any disabling psychiatric

condition. (R. at 379-87.) Additionally, the ALJ noted that Murphy was prescribed

medication for depression by her general practitioners, but there is no evidence

indicating that she was ever formally diagnosed by a licenced psychiatrist. (R. at 551.)

Furthermore, the majority of the ALJ's decision did address and give credence to the

medical findings of Murphy's doctors. Therefore, the Court finds the ALJ did not give

Turl's report undue credit.

**D. The Hypothetical Was Not Incomplete.**

Murphy argues that the hypothetical presented to the VE failed to include all her

limitations because the ALJ did not include a sit/stand option, limitations for her asthma,

COPD, incontinence and panic attacks. (R. at 924 -25.) The ALJ only has to include the

limitations that he found to be credible. *See* Meredith v. Bowen, 833 F.2d 550 (7th Cir.

1987). In reviewing the evidence before the Court, it is clear the ALJ properly addressed

all of Murphy's limitations that were substantially supported by the record.

Murphy claims that the ALJ ignored the effects of her panic attacks and her

chronic inflamation of the vocal chords in his hypothetical.  However, a review of the

hypothetical indicates that he did acknowledge Murphy's panic attacks because he

included a limitation for low stress work environments where she could work at an

individual pace, despite the findings of both consulting psychiatrists. (R. at 61.)  The ALJ

also addressed her chronic inflamation of the vocal chords because he included her

need to be limited to "frequent talking". (R. at 1019-23.)

Additionally, the ALJ included in his hypothetical limitations that Murphy needed to

avoid environments with "concentrated exposures to temperature extremes, fumes,

dusts, odors, chemicals, gases, humidity and wetness." (R. at 61).  The Seventh Circuit

has held that a hypothetical that does not directly reference a specific condition is still

sufficient if it includes similar limiting factors. *See* Heller v. Barnhart, 126 Fed.Appx. 313,

315 (7th Cir. 2005) (a hypothetical properly included moderate concentration limitations when it  referred to the claimant taking medications causing drowsiness). While the ALJ did not mention asthma, COPD, or chronic bronchitis by name, all of the factors he listed are limitations reasonably consistent with an individual suffering from a respiratory condition. (R at 63.) Also, while it is true that the hypothetical recorded in the ALJ's decision does not include a sit/stand option, the ALJ did include the need for a sit/stand option in the hypothetical he posed to the VE at the hearing. (R. at 1054-56.) Therefore, the VE's answer reflected the need for a sit/stand option and does not contradict the ALJ's decision.

Moreover, Murphy's counsel had the opportunity to change limitations included in the hypothetical during cross-examination; however, he never added a need for frequent bathroom breaks. (R. at 1004-68.) Instead, Murphy's counsel focused on the difference between "no extremes in climate" verses "climate controlled", "frequent" verses "occasional" talking and "light" verses "sedentary" work. (R. at 1060-66.) When the ALJ asked Murphy what she felt were her greatest limitations, she only mentioned her "shaking and her breathing." (R. at 1018.) This implies that at the time of the hearing, Murphy's only objection was to the intensity of the limitations that the ALJ presented to the VE rather than the fact that the ALJ ignored some of Murphy's limitations.

Ultimately, the ALJ found that Murphy's allegations regarding the severity of her limitations were not supported by substantial objective evidence in the record. When the claimant poses a hypothetical including such unsupported limitations, the ALJ is not obligated to defer to it. *See* Page v. Barnhart, 2005 WL 335566 (C.A.7 (Wis.)). As reflected in the ALJ's decision, most of Murphy's illnesses are either controlled by

22

medications or have been classified as mild and non-disabling. (R. at 56-58.) As such, the ALJ did not have to include them as disabling limitations in his hypothetical because they were not supported by substantial evidence. *See* Cassidy v. Schweiker, 663 F.2d 745 (7th Cir. 1981) (if an impairment is amenable to treatment, there is no disability). Therefore, the Court finds that the hypothetical the ALJ presented to the VE is sufficiently supported by substantial evidence as being a proper reflection of Murphy's limitations.

### B. Murphy's Right to Due Process Were Not Violated.

Murphy alleges that her right to due process was violated because the ALJ did not demand that the VE provide the occupational title numbers for the jobs he testified that Murphy was still able to perform. However, a review of the case law shows that the ALJ was under no obligation to make the VE provide those numbers and that Murphy waived her right to claim a due process violation.

Murphy relies on  McKinnie v. Barnhart, 368 F.3d 907 (7th Cir. 2004) as support for this claim.  In McKinnie, the Court remanded the case because the claimant's attorney questioned the VE's reliability at the hearing and the ALJ failed to investigate the VE's evasive response. Id., at 909-10. Case law requires an ALJ to investigate the foundation of a VE's testimony when it is questioned at the hearing, but it also holds that "raising the discrepancy after the hearing is too late." Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002).  In the instant case, Murphy's counsel never questioned how the VE came to his conclusion about which jobs Murphy could still perform and never made any objection that the VE's testimony was unreliable because he did not list the occupational title numbers for those jobs he referred to during the hearing. Therefore, the Court finds that Murphy has waived her objection because she did not question the

23

validity of the VE's testimony for not including the occupational title numbers at the hearing.

## **Conclusion**

For the reasons set forth herein, Plaintiff's Motion for Summary Reversal [#11] is DENIED, and Commissioner's Motion for Summary Affirmance [#15] is GRANTED. The Commissioner's decision denying benefits to Murphy is AFFIRMED. This matter is now terminated.

ENTERED this 19th day of July, 2006.

s/ Michael M. Mihm
Michael M. Mihm
United States District Judge